Charles Quitman STEPHENS,
Plaintiff-Appellant,

v.

CITY OF MEMPHIS and Memphis
Publishing Company, et al.,
Defendants-Appellees.

Court of Appeals of Tennessee,
Western Section.

May 23, 1977.

Rehearing Denied Aug. 10, 1977.

Certiorari Denied by Supreme Court
Feb. 13, 1978.

Harvey L. Gipson, Robert A. Tucker, Memphis, for plaintiff-appellant.

Marshall Gerber, Memphis, for defendant-appellee, City of Memphis.

Armistead F. Clay, Memphis, for defendant-appellee, Memphis Publishing Co.

Dale Woodall, Memphis, for defendant-appellee, Memphis Area Chamber of Commerce & Downtown Assn.

Edward L. Welch, Edwardsville, Ill., for defendant-appellee, National Alliance of Postal & Federal Employees.

CARNEY, Presiding Judge.

The Plaintiff below, Charles Quitman Stephens, brought suit against the several Defendants to recover rewards offered by them for information leading to the arrest and conviction of the murderer of Dr. Martin Luther King, Jr. Dr. King was shot to death from ambush at the Loraine Motel in Memphis, Tennessee, on April 4, 1968.

The Chancellor found that the rewards offered by the Appellees were:

| | | |
|---|---|---|
| (1) | Memphis Publishing Company ... | $50,000.00 |
| (2) | Memphis Chamber of Commerce, Downtown Association and Future Memphis, Inc. ............... | 25,000.00 |
| (3) | Mrs. Wells Awsumb ........... | 1,000.00 |
| (4) | National Alliance of Postal Employees .................... | 10,000.00 |
| (5) | City of Memphis ............... | 5,000.00 |
| (6) | City Councilmen .............. | 8,915.00 |
| (7) | Cash donations in the hands of Banks of Memphis ............ | 85.00 |
| | TOTAL ........ | $100,000.00 |

His Honor the Chancellor denied recovery on two grounds: (1) Plaintiff gave the Memphis Police practically all the material information he had on the evening of April 4, 1968, immediately after the death of Dr. King and before the rewards had been offered; (2) Information furnished by Plaintiff did not lead to the identification and arrest of James Earl Ray as the murderer. The Plaintiff's suit was dismissed and Plaintiff has appealed.

Assignment of error No. I is that the Chancellor erred in finding that the Plaintiff was a recalcitrant witness. We do not find any place in the record where this finding is made. This was one of the de-

fenses made. However, His Honor the Chancellor, in summing up the theories of the defense, omitted this particular defense.

Plaintiff had been arrested many times by the Memphis Police for public drunkenness. He was a material witness against whomever might be arrested for the murder. Plaintiff was incarcerated by the Attorney General as a material witness with consent of the Plaintiff. The Attorney General feared for the life of Plaintiff and also wanted to be sure Plaintiff was available to identify the murderer when apprehended.

District Attorney General Phil Canale, Jr. complimented the Plaintiff for his cooperation with the Memphis City Police. If His Honor the Chancellor had, in fact, found that the Plaintiff was a recalcitrant witness, we would disagree but could not characterize it as reversible error.

Assignment of error No. II is as follows: "The Honorable Chancellor below erred, contrary to the proof herein, in finding that the plaintiff did not give the information with the intent to collect said rewards; erred in finding that said material information was given prior to the offer of rewards; and erred in finding that said information did not lead to the arrest and conviction of the assassin of Martin Luther King, Jr."

On April 4, 1968, Dr. Martin Luther King, Jr. had been in Memphis several days in support of the strike of the Memphis Sanitation and Garbage Workers. Dr. King had been staying at the Loraine Motel. The bathroom window at the east end of the hall in a rooming house at 422½ South Main Street in Memphis overlooked the front of the Loraine Motel about a block away.

About noon on April 4, 1968, a white man calling himself Jim Willard rented apartment 5–B of the rooming house located at 422½ South Main Street in Memphis, Tennessee. The Plaintiff Stephens was a longtime occupant of apartment 6–B in the same rooming house. He saw the white man, alias Jim Willard, talking to the landlady at the time he rented the apartment. The bathroom at the east end of the hall of the rooming house was between apartments 5–B and 6–B.

For about forty-five minutes prior to 4:30 P.M., someone had been locked in the bathroom. About 4:30 P.M., the Plaintiff, who was in his own apartment, heard a shot which seemed to come from the bathroom. He also heard shouting from the Loraine Motel. He opened the door of his apartment into the hall and saw the person who had called himself Jim Willard running down the east end of the hall westward toward the stairway at the front door carrying a package under his arm. The package was about four feet long and several inches thick covered with some fabric or material which may have been cloth or may have been a newspaper.

A short time after the shooting, witnesses in the Canipe Amusement Company located at 424 South Main Street immediately south of the rooming house on the same side of the street, heard a peculiar noise as if something was being thrown or dropped; they saw a white man get into a white Mustang Ford automobile which was parked on the east side of South Main Street almost in front of 424 South Main Street, and drive northwardly on Main Street at a very rapid rate of speed. Very shortly after the man sped away a package similar to the one described by Plaintiff as having been carried by the occupant of apartment 5–B was picked up just outside the doorway of the Canipe Amusement Company. The package was wrapped in a bedspread and contained a rifle, binoculars, suitcase and several articles of clothing. All circumstances pointed to the occupant of apartment 5–B as the murderer of Dr. King.

Plaintiff talked to the police within minutes after the shooting and described the suspect as follows:

". . . the man was 5' 11", medium build, 160 to 165 lbs., dark sandy hair, ruddy complexion, 30 to 32 years, was wearing a black suit, white shirt and a dark colored tie, that he thought was black in that it was a plain tie without any figures on it."

About 9:30 P.M., he talked with police officers and the F.B.I. again and enlarged upon the description of the suspect as follows:

". . . he was around my height, I am 6′ 1″ and he was around my height, he had dark sandy colored hair, and he had a slightly receding portion of hair, you see, his hair came out in the middle to a point, but on both sides of his head, it was getting bald. He had on a black suit, white shirt, and it was either a coal black tie or it was a dark tie, but it was all one color, he was slender built, he wasn't heavy set, he was slender, weighed about 162 to 163, somewhere in there, and he was between 30 and 32."

There were fingerprints on the rifle and on the binoculars which were identified by the F.B.I. as being the fingerprints of James Earl Ray, a fugitive from the Missouri State Prison. Laundry marks on some of the clothes found were traced to a laundry in Los Angeles, California, indicating the owner of the clothes to be Eric S. Galt. This investigation in the Los Angeles area led to a bartending school. Eric S. Galt had graduated as a bartender and each graduate had his picture taken with the supervisor of the school. The supervisor of the school produced a picture of himself standing with Eric S. Galt holding the graduation certificate up with the name of Eric S. Galt plainly visible on the certificate. The F.B.I. compared pictures of James Earl Ray with Eric S. Galt and decided that they were one and the same. Investigation revealed that Eric S. Galt had registered at the Rebel Motel in Memphis on the night of April 3, 1968.

After James Earl Ray's fingerprints had been identified as those on the rifle and the binoculars, the Plaintiff was shown a picture of James Earl Ray, the fugitive, and identified him as the man who had rented apartment 5–B on April 4, 1968. This identification was made by Plaintiff after he had learned about the rewards.

James Earl Ray was the only person being sought as the murderer of Dr. Martin Luther King. His pictures were circulated among all the law enforcement agencies throughout the country. His trail led to Canada where James Earl Ray was identified as Raymon George Sneyd who had procured a passport from Canada to go to London. James Earl Ray was followed from London to Portugal and back to London. Ray was about to board a plane to go to Brussels, Belgium, when a member of Scotland Yard recognized him from a picture as James Earl Ray, alias Raymon Sneyd. He was immediately arrested and brought back to Memphis for trial.

The police learned that James Earl Ray had bought the rifle at the Aeromarine Supply Company in Birmingham, Alabama, under the name of Harvey Lowmyer. Witnesses identified Ray's picture as the purchaser. The white Mustang automobile was also purchased by Ray in Birmingham, Alabama, from an ad which appeared in the paper. It was abandoned on the morning of April 5, 1968, in Atlanta, the day after Dr. King was killed. The F.B.I. located witnesses who could prove that James Earl Ray lived in Atlanta for a while after the assassination.

The ballistics experts could testify that a bullet from Dr. King's body probably was fired from the rifle found in front of Canipe Amusement. The bullet was damaged making it impossible to exclude all other rifles of the same type and caliber.

James Earl Ray pleaded guilty to murder in the Criminal Court of Shelby County, Tennessee, and did not go to trial. Plaintiff would have been a material witness but not an indispensable witness if James Earl Ray had pleaded not guilty and it had been necessary to go to trial in the cause.

From the Chancellor's memorandum opinion we quote as follows:

"The right of a claimant to recover a reward is summarized in an annotation in 100 A.L.R.2d, 577. On page 577 the Rule is stated as follows:

'Although there appears to be considerable variation in the language of reward offers, it seems that, basically, there are two kinds: (1) rewards offered for the "arrest" or "arrest and

conviction," and the like; and (2) rewards which specifically allow recovery by a person "furnishing information leading to" the arrest, conviction, and the like. However, it seems that irrespective of the particular type of reward offer involved, recovery of a private reward is governed by the well-settled principles of the law of contracts. Thus, it has been held that in order for a furnisher of information to recover under a private reward it must be shown that he had knowledge of the reward offer and that he acted with the intention of claiming it. Generally, in order to recover a reward, all that is necessary is a substantial (rather than a literal) compliance with the reward offer. A number of cases have taken the view that in order to become entitled to a reward the claimant must have furnished the first effective information which was the active and efficient means of apprehension or proximately resulted in the arrest of the criminal.'

This annotation supplements an earlier one in 53 A.L.R. 542, wherein the case of *Stamper v. Temple* (1845), 25 Tenn. 113, is cited in support of the majority view that knowledge of the offer of the reward at the time of giving the information is a prerequisite to recovery.

In the *Stamper* case the trial judge charged the jury that if the reward were in fact offered the plaintiffs would be entitled to recover notwithstanding they had no knowledge of the offer. Turley, J., speaking for the Court, said:

'In this charge the whole Court agree that there is error. The Judge, in the first place, charged the jury that there must be a contract of reward to be paid before a suit could be maintained for the recovery of the reward. To make a good contract there must be an aggregatio mentium, an agreement on the one part to give, and on the other to receive. How could there be such an agreement if the plaintiffs in this case made the arrest in ignorance that a reward had been offered? The arrest

would have been made, not for the reward, but in discharge of the public duty.'

Citing this case among others the author of a note in 14 Va.Law Rev. 124, has this to say:

'Although there are a number of highly respectable authorities upon each side of this question, the weight of authority seems to favor a denial of recovery where there is no prior knowledge of the offer.

Looking at this question according to reason and principle, it is submitted that a private individual is not legally liable upon an offer of a reward unless the acts have been performed with knowledge of the offer, and a fortiori he is not liable when the acts were performed before the offer had been made. If it be conceded that this is a matter of contract, then, it needs no argument to establish the fact that one cannot accept an offer of which he has never heard. Since an acceptance is absolutely necessary to make a binding contract, there can be no recovery in such a case.'

An examination of the various statements made by Stephens and contained in the record together with his testimony as quoted above reflects that he gave to the police all the information he had on the evening of April 4th, and his statement of April 5th in further interviews with the police and the FBI disclosed no information that had not already been given by him to the police on the evening of April 4th."

In the case of *Stair v. Heska Amone Congregation* (1913), 128 Tenn. 190, 159 S.W. 840, our Tennessee Supreme Court said, "The better rule is that he who is the active and efficient cause in securing the result described in an offer of reward is the one entitled to it. He is the one who accomplishes the result—who brings it about."

Also, from 67 *Am.Jur.*2d 17, Section 22, we quote as follows:

"A reward offered for information leading to the arrest and conviction of an offender is earned by the person who first communicates the information that ultimately leads to both. In order to become entitled to the reward, the claimant must be the first person to give information to the proper authorities, and the information must be effective in leading to the arrest and conviction of the offender," citing *Kincaid Trust & Savings Bank v. Hawkins*, 234 Ill.App. 64; *County Court of Braxton County v. Smith*, 110 W.Va. 392, 158 S.E. 377.

We concur in the findings of the Chancellor and in his application of the law. The information furnished by Plaintiff did not lead to the identification and arrest of James Earl Ray. The fingerprints and laundry marks did. The information furnished by Plaintiff before the rewards were offered led to the conviction of James Earl Ray.

Therefore, assignment of error No. II is respectfully overruled. The judgment of the lower Court is affirmed and the costs in the Court below and in this Court are taxed to the Plaintiff.

Done at Jackson in the two hundred and first year of our Independence and in the one hundred and eighty-second year of our Statehood.

MATHERNE, J., concurs.

NEARN, J., dissents.

NEARN, Judge.

I concur in so much of the Opinion that holds that the information furnished by plaintiff did not lead to the identification and arrest of James Earl Ray. For that reason alone, plaintiff is not entitled to recover. Therefore, I will concur in the results reached by the majority.

From so much of the Opinion that indicates that it is the law of this state that prior knowledge of the existence of a reward is a prerequisite of recovery, I dissent with all of the fervor I can command.

I admit that "the weight of authority seems to favor a denial of recovery where there is no prior knowledge of the offer", but until the Supreme Court of this state speaks clearly on the subject, I care not where the weight of foreign authorities lies. Even if our 49 sister states and all the possessions and territories of the federal government would hold that recovery is dependent upon prior knowledge of the offer, I would hold otherwise for this state.

Reliance upon the case of *Stamper v. Temple* (1845) 25 Tenn. (6 Humph.) 113, is in my opinion, entirely misplaced. In one of the briefs filed in this case it is submitted "that in the 130 year period since *Stamper* was decided Tennessee has been constantly put in the 'majority view' and the law is so well settled in that regard that it appears beyond question." I question it. The case involved an alleged offer of reward and the arrest of the felon by *a regular deputy sheriff*. If the headnotes of the case are ignored and its full text read, it becomes apparent that recovery was denied and the case was decided on the fact that there never was a reward offered, viz., "We do not think that the proof establishes the fact that a reward of $200 was actually offered  *  *  *  as we frequently hear persons exclaim, Oh! I would give a thousand dollars if such an event were to happen, or, *vice versa*. No contract can be made out of such expressions; they are evidence of strong excitement, but not of a contracting intention."

The *Stamper* Court also explicitly held that "___ Jonathan Lassater, in making the arrest, was in the line of his duty; *he was deputy sheriff* of the county where the outrage had been committed; he had been sent by the principal sheriff to attend to it in his stead. Under such circumstances a majority of the court held that, as a matter of public policy, he would not have been entitled to claim the reward had it been offered." (Emphasis supplied.)

Prior to making the above mentioned holding and announcement of public policy the Court stated,

"___ The judge, in the first place, charged the jury that there must be a contract of reward to be paid before a suit could be maintained for the recovery of the reward. To make a good contract there must be an *aggregatio mentium*, an agreement on the one part to give, and on the other to receive. How could there be such an agreement if the plaintiffs in this case made the arrest in ignorance that a reward had been offered? The arrest would have been made, not for the reward, *but in discharge of the public duty*." (Emphasis mine)

The annotator took the foregoing to mean that "there must be an offer clearly intended as such, and knowledge of the offer by the other party at the time of making the arrest." (Underscoring mine.) Even if such interpretation be correct, it is dicta. Especially so when the Opinion states the other reasons given for reversal are of a "higher character". The query made by the Court and relied upon by annotators was certainly unnecessary for the decision of a case which held there was no contract in the first place. However, the query and its answer could just as easily mean that a deputy sheriff could not collect for exercising an option he did not have; for he was *bound* under his oath to make the arrest and had no choice.

It would seem to me that the annotators, who for 130 years have placed Tennessee in the "majority" camp, have relied more on interpretation of dicta contained in other annotators' headnotes than the actual statements of the Court.

It is my opinion that those states which have based a requirement of "prior knowledge" solely on theories of contract have engaged in nothing more than judicial fantasy. "Contract" concepts are theories of the marketplace. Contracts generally are equated with thoughts of "buy and sell", "profit and loss", "quid pro quo" and mutual consideration. That is to say, something is going to be exchanged between the parties. You get something for something. In the business world of contracts you are not supposed to receive nothing for something.

What does the offerer of a reward receive for his money?

The end purpose of a private offer of reward for information leading to arrest and conviction of a perpetrator of a crime should be to bring a public enemy to the bar of justice. The offerer receives nothing for the payment of a reward other than the satisfaction of seeing the guilty convicted. This should be the same satisfaction of every citizen, except perhaps the one convicted. To apply a marketplace theory to the matter of rewards is to apply the marketplace theory to criminal justice, which application, to my mind, is anathema.

Additionally, to base the payment of a reward on "prior knowledge" ought to be against the public policy of this state. Just what constitutes "public policy" is a matter of considerable dissertation by text writers. It is my position that if the policy inhibits justice and promotes fraud it is against the public policy of the state of Tennessee. What policy could be more fraught with impediments to justice and with fraud than one that says to the public, "Citizens, if you come forward and do your civic duty promptly as you should, without knowledge or thought of reward, you shall forfeit all claims to any funds which have been offered by other public-minded citizens to induce the citizenry to come forward and do their duty as they should. However, citizen, if you do not do your duty as you should, but on the contrary, wait until the 'pot is right' and you are assured that top dollar will be paid for the information which you ought to have promptly given in the first instance, then you may come forward with your concealed information and you will be amply rewarded for your delay of justice and personal avarice." To hold "prior knowledge" necessary for recovery is to make that statement to the people of this state.

Done at Jackson in the two hundred and first year of our Independence and in the one hundred and eighty-second year of our Statehood.

PETITION TO REHEAR DENIED

CARNEY, Presiding Judge.

On May 23, 1977, this Court announced an opinion affirming the judgment of the lower Court which denied the Plaintiff's suit for recovery of approximately $100,000 in rewards offered after the murder of Dr. Martin Luther King, Jr., in Memphis, Tennessee, on April 4, 1968. The Plaintiff has filed a petition to rehear in which he very earnestly insists that this Court should adopt the views expressed by our distinguished colleague, Judge Nearn, in his very forceful dissenting opinion filed in this case. We have reread our former opinion along with the dissenting opinion of Judge Nearn and after deliberate thoughtful consideration, the majority adheres to the opinion announced on May 23, 1977.

The Petition to Rehear is, therefore, respectfully denied at the cost of the Plaintiff.

MATHERNE, J., concurs.

NEARN, J., dissents.